# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
January 10, 2018 Session Heard at Knoxville

## STATE OF TENNESSEE v. DAVID SCOTT HALL

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Davidson County**
**No. 2010-D-3534     Monte D. Watkins, Judge**

_____

## No.  M2015-02402-SC-R11-CD

_____

We granted permission to appeal in this case to assess the sufficiency of the evidence for a conviction for attempted especially aggravated sexual exploitation of a minor, i.e., attempted production of child pornography, in the wake of our decision in *State v. Whited*, 506 S.W.3d 416 (Tenn. 2016).  The defendant hid a video camera in the minor victim's bedroom, aimed to record the area of her bedroom where she normally changed clothes.  Soon after the victim returned to her bedroom, fully clothed, she noticed the camera and turned it off.  Consequently, the resulting video did not depict the minor in any degree of nudity.  The defendant was charged with attempted especially aggravated sexual exploitation of a minor and was convicted of that offense after a bench trial.  The Court of Criminal Appeals affirmed, and we granted permission to appeal.  On appeal, the defendant argues that the evidence was insufficient to support a finding that he attempted to produce material that would include a depiction of a minor in a "lascivious exhibition" of her private body areas, as required under Tennessee's child sexual exploitation statutes and construed in *Whited*.  We agree.  The evidence presented at trial shows at most that the defendant intended to produce material that would include images of the minor victim engaged in everyday activities ordinarily performed in the nude, which were deemed insufficient in *Whited* to constitute a "lascivious exhibition" under Tennessee's child sexual exploitation statutes.  Consequently, we hold that the evidence, even when viewed in a light most favorable to the verdict, is insufficient to support an inference that the defendant intended to record, and believed he would record, the minor victim engaged in a lascivious exhibition of her private body areas.  Accordingly, we reverse the defendant's conviction.

HOLLY KIRBY, J., delivered the opinion of the Court, in which CORNELIA A. CLARK and SHARON G. LEE, JJ., joined. ROGER A. PAGE, J., filed a dissenting opinion, in which JEFFREY S. BIVINS, C.J., joined.

Manuel B. Russ (on appeal), Nashville, Tennessee; Mark Kovach (at trial), Nashville, Tennessee, for the appellant, David Scott Hall.

Herbert H. Slatery III, Attorney General & Reporter; Andrée S. Blumenstein, Solicitor General; and Andrew C. Coulam, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Deborah Housel, Assistant District Attorney General, for the for the appellee, State of Tennessee.


# OPINION

## FACTUAL AND PROCEDURAL BACKGROUND

During May 2010, Defendant/Appellant David Scott Hall lived with his second cousin, E.M. ("Mother"),[1] and her two minor daughters in Nashville, Tennessee. The Defendant had moved in with the family temporarily in order to help them repair damage from a recent flood. At that time, the Defendant was fifty years old, Mother's older daughter, A.M.M. ("the Victim"), was thirteen years old, and her younger daughter, A.M. ("Sister"), was eleven years old.

Each of the daughters had her own bedroom, but they shared the guest bathroom that was between their bedrooms. While the Defendant stayed in their home, he shared the guest bathroom with the daughters.

On May 18, 2010, around 6:30 in the morning, the Victim took a shower before school. After showering, she put on casual clothes while still in the bathroom and then walked across the hall to her bedroom. When the Victim entered her bedroom, she turned on the light and noticed that items on her bed had been "ruffled." She then turned

---

[1] To protect the victim's identity, we will refer to the victim, her mother, and her sister by generic designations throughout this opinion.

toward her dresser and saw the red "recording" light of a camera sitting on her dresser under some clothes. She went over to the dresser and grabbed the camera. The Victim immediately recognized the camera as one that belonged to the Defendant. The Victim took the camera to her younger sister, and together they played the last recorded video saved on the camera.

The seven-minute video initially focused for a few seconds on the Victim's fish tank, which sat on her dresser. The camera was then set down on the Victim's dresser next to the fish tank.[2] The back of the camera faced the wall behind the dresser, and the lens faced the bedroom. The image on the video appeared as though the camera was adjusted before it became still, aimed into the Victim's bedroom.[3]

Once the camera finally became still, about 12 seconds into the video, the left side of the video frame showed the end of the Victim's bed with piles of clothes on it, the left-center of the frame showed the bedroom's only window near the foot of the bed, the right-center of the frame showed the Victim's open closet, and the right edge of the video showed the wall next to the closet. Because light was coming from the window, the resulting images in the video were backlit and dark.

In the video, just after the camera was placed on the Victim's dresser, a partial view of the midsection of a male figure, later identified as the Defendant, could be seen along the right edge of the frame. About 45 seconds into the video, the camera was jostled, which made the lens turn down slightly toward the surface of the dresser.

The camera then remained still, with the video frame centered on the open space of the room in the vicinity of the bed, the window, and the closet. The Defendant's mid-torso appeared intermittently in the frame as he walked back and forth across the camera's view twice. About two minutes and forty seconds into the video, the Defendant left the room. The video was accompanied by sound, but the only identifiable sounds were light noises from the fish tank, a buzzing sound that seemed to come from an electric device, and the sound of a dresser drawer opening.[4]

---

[2] The foreground of the video frame showed a zebra-patterned tablecloth that covered Victim's dresser; this indicated that the camera was placed directly on the dresser.

[3] Commenting on the video, Mother later said that, from her perspective, it seemed "obvious that [the operator was] setting . . . and arranging" the camera to focus on the part of the room where the Victim would be undressing.

About four minutes after the Defendant left the Victim's bedroom, the fully clothed Victim returned to her room after taking a shower. She switched on the light, placed some clothes on her bed, and turned to walk toward her dresser. At that point, the Victim was standing in the open space of her room in the center of the video frame. Only her torso, from the upper thigh to the neck, was visible. She was wearing what appeared to be pajama shorts and a loose-fitting t-shirt, and her hair was wrapped in a towel. The Victim then turned and approached the dresser. As she did, the center of her chest took up most of the frame. The Victim noticed the camera's red "recording" light, and the video showed the Victim quickly picking the camera up and turning it off. All told, the Victim was visible in the video for less than fifteen seconds.

As the Victim and Sister watched the video, they recognized the man who appeared in it as the Defendant. They then took the camera to Mother and played the video for her. At that point, Mother told the girls to get ready for school while she went and talked to the Defendant.

Mother went upstairs where the Defendant was staying and asked him if he had been downstairs that morning. He acknowledged he had been downstairs to the bathroom, but he denied entering either of her daughters' rooms. Mother then made an excuse and asked the Defendant to leave their home.

After Mother dropped her daughters off at school, she went to the police department. She turned the camera containing the video over to the police and filed a report.

Detective Chad Gish of the Metropolitan Nashville Police Department conducted a forensic examination of the Defendant's camera. In addition to the original video viewed by Mother, Sister, and the Victim, investigators recovered from the camera what the State described as a "test" video, recorded about a minute before the original video and then deleted. The deleted video was forty-two seconds long. It started by focusing on Victim's fish tank, just as the other video did. After about three seconds of fish video, the camera lens panned the Victim's bedroom. The camera was then placed on the dresser and aimed toward the middle of the room. The test video was accompanied by the same sounds, light noises from the fish tank and a faint buzzing sound. Detective Gish showed the videos to Detective Michael Adkins, who in turn obtained a warrant to search the Defendant's home.

---

[4] The Defendant later conceded that the sound in the video was likely him opening a dresser drawer.

- 4 -

About three weeks after the videos were taken, police investigators had Mother make a controlled telephone call to the Defendant. In the phone call, Mother confronted the Defendant for the first time with the fact that she had found his camera in the Victim's bedroom and had discovered the video of the Victim on the camera. The Defendant professed to be unaware until that moment that Mother had his camera; he claimed that he had assumed it was in his truck. In response to Mother's questions, the Defendant said repeatedly that he did not remember recording the Victim and was unaware of the existence of the video. After Mother told him the video was taken on the day he left their home, the Defendant said he recalled perhaps going into the Victim's room to look for his prescription sunglasses.[5] He added, however, that he did not recall what happened or how the camera began recording a video. The Defendant asked to see the video, but Mother refused.

In further response to Mother's questions in the controlled telephone call, the Defendant said he might have gone into the Victim's room that morning to feed the fish in the Victim's fish tank while he was waiting to use the bathroom. The Defendant supposed he might have inadvertently put his camera down on the Victim's dresser at that time.

While Mother and the Defendant were talking on the phone, police officers were stationed outside the Defendant's home waiting to execute the search warrant. As planned, moments after the controlled call was completed, the officers conducted the search of the Defendant's home.[6] While some of the officers searched the Defendant's home, Detective Adkins asked the Defendant to speak with him. The two then talked in the police van for over an hour. Despite the length of the conversation, the Defendant refused to admit any wrongdoing. Meanwhile, in the search of the Defendant's home, officers seized the Defendant's electronic devices, including a computer and a cellular telephone, as well as several external memory devices in the form of DVDs, phone drives, or memory sticks.

In December 2010, the Davidson County Grand Jury indicted the Defendant for attempted especially aggravated sexual exploitation of a minor, in violation of Tennessee

---

[5] During the controlled conversation, Mother acknowledged to the Defendant that his sunglasses "look just like" the Victim's sunglasses and that she "kept putting those sunglasses" in the Victim's bedroom.

[6] Although the search warrant did not authorize a search of the Defendant's car, the Defendant voluntarily allowed the officers to search his car.

Code Annotated sections 39-17-1005 (2014) and 39-12-101(a)(2) (2014).[7] The Defendant elected to be tried without a jury.

The bench trial began on February 2, 2015. As its proof, the State offered the testimony of Mother, Sister, the Victim, Detective Gish, and Detective Adkins.[8] It also introduced into evidence the two videos discovered on the Defendant's camera; both videos had been visually enhanced for trial.

Detective Gish testified about the forensic analysis of the Defendant's camera, his computer, and his other belongings. He said the examination revealed no child pornography on any of the Defendant's items. Detective Gish was then asked: "Did you find any pornography at all?" He responded, "I did. . . . [T]here was some." The Defendant objected to this testimony, but the trial court allowed it.

The Victim testified as well. Describing her typical morning routine on weekdays, the Victim said she would wake up in the morning, awaken Sister, and then take a fifteen-minute shower. When the family had male guests such as the Defendant, she said, she would put on clothes in the bathroom before returning to her bedroom after showering instead of walking across the hall wrapped in only a towel.[9] After returning to her bedroom, the Victim said she would normally dress for the day in the open space between her dresser and her bed. In her small bedroom, she explained, this was the only space large enough to put on clothes.

---

[7] The sexual exploitation statute provides that "[i]t is unlawful for a person to knowingly . . . use . . . a minor to participate in . . . the production of . . . material that includes the minor engaging in . . . [s]exual activity." Tenn. Code Ann. § 39-17-1005(a)(1). In this context, "[s]exual activity" means "[l]ascivious exhibition of the female breast or the genitals, buttocks, anus or pubic or rectal area of any person." *Id.* § 39-17-1002(8)(G). The applicable section of the attempt statute provides: "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense[,] . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." *Id.* § 39-12-101(a)(2). We cite to the current version of the statutes because there is no material difference between the version of those now in effect and those in effect at the time of the subject crime.

[8] For a more thorough recitation of the trial testimony, see *State v. Hall*, No. M2015-02402-CCA-R3-CD, 2017 WL 1655616, at *1-5 (Tenn. Crim App. May 2, 2017), *perm. app. granted* (Tenn. Aug. 16, 2017).

[9] The Victim and Sister both testified that Mother enforced a "house rule" requiring them to put on clothes before leaving the bathroom when there was a man in the house.

The Victim testified about finding the Defendant's camera in her bedroom. On the day in question, she said, she returned to her bedroom fully clothed after her shower and noticed that the clothes on her bed "had been ruffled." She said, "I didn't remember them being that way when I had left." The Victim said she then looked in the direction of her dresser and walked toward it "to get some underwear." She continued: "And when I started looking through the clothes [on the dresser] I saw a red dot and two little bra cup things. And a red dot. So I unveiled it and there was a camera." The Victim recognized it as the Defendant's camera. When she picked up the camera, it appeared to stop recording. The Victim then took the camera to Sister, who knew how to play the video, and together they watched it. They both then took the camera to Mother.

The Defendant elected to testify on his own behalf. On the morning the video was taken, the Defendant recalled, as he walked past the Victim's bedroom on his way to use the bathroom, he heard a cellular telephone alarm. He claimed he went into the Victim's bedroom because he noticed her cellular telephone connected to his charger, which the Victim had borrowed.

At that point, the Defendant said, he noticed the Victim's fish tank and decided to take some video of the fish. The Defendant explained that, as an amateur photographer, he enjoys taking pictures and videos. After he took the first video, he deleted it, purportedly because he was unsatisfied with the shot. According to the Defendant, he began shooting the second video and then placed the camera on the dresser while he fed the fish "to try to coax the fish out." As he was feeding the fish, the Defendant claimed, he noticed his prescription sunglasses in the Victim's bedroom. Distracted by seeing his sunglasses, he said, he spent a few moments "just nosing around, being nosey" before he left the Victim's bedroom, inadvertently leaving his camera behind. The Defendant claimed his camera was left on the Victim's dresser because he "forgot [it], just to be honest."

On cross-examination of the Defendant, the State introduced into evidence a letter addressed to Davidson County District Attorney General Torry Johnson, written by the Defendant in July 2014, between six and seven months before trial. In the letter, the Defendant offered a somewhat different explanation of his behavior on the morning of May 18, 2010. He wrote that he initially went into the Victim's bedroom "probably . . . to feed the fish" in the fish tank. While feeding the fish, he allegedly noticed his prescription sunglasses, which had "kept disappearing," so he decided to look around the Victim's room "to see if she had any more of [his] stuff." According to the Defendant, he also found his cellular telephone charger in the Victim's room. He said he was happy

- 7 -

to have found his sunglasses, so he brought them upstairs and did not remember leaving his camera in the Victim's bedroom. If it was left there, the Defendant claimed, it was not intentional.

Following the close of proof, the trial court found the Defendant guilty as charged of attempted especially aggravated sexual exploitation of a minor, a Class C felony. After a sentencing hearing, the trial court imposed a sentence of four years' imprisonment, suspended after service of one year in confinement.

The Defendant appealed his conviction and sentence.[10] He argued, among other things, that the evidence was insufficient to support his conviction and that the trial court erred by allowing Detective Gish to testify concerning the adult pornography found on his computer.[11]

The Court of Criminal Appeals affirmed the trial court on both issues. It first held the evidence sufficient to support the Defendant's conviction. *State v. Hall*, No. M2015-02402-CCA-R3-CD, 2017 WL 1655616, at *8 (Tenn. Crim. App. May 2, 2017), *perm. app. granted* (Tenn. Aug. 16, 2017). Citing this Court's recent decision in *State v. Whited*, 506 S.W.3d 416 (Tenn. 2016), which also involved hidden-camera video of minors, the intermediate appellate court reasoned:

> In considering whether the Appellant attempted to record lascivious exhibition of the victim's private body areas, the evidence shows that, had the victim not found the camera, it would have recorded her bare breasts, pubic area, and buttocks while she engaged in the everyday activity of dressing after showering. She was not posed or coached for the video, and

---

[10] In March 2016, after he was released from incarceration, the Defendant filed a Petition for Writ of Error *Coram Nobis* based on subsequently discovered evidence. *See* Tenn. Code Ann. § 40-26-105 (2012). The trial court rejected the petition based on its finding that the subsequently discovered evidence "would not have altered the verdict." The Defendant's appeal of the *coram nobis* ruling was consolidated with the direct appeal of his conviction.

[11] The Defendant also raised several other issues in his appeal to the Court of Criminal Appeals, claiming that the trial court erred in (1) denying *coram nobis* relief, (2) violating his right to a speedy trial, (3) admitting certain evidence without showing a proper chain of custody, (4) admitting only a portion of the controlled telephone call, (5) allowing the Victim to testify about habit, (6) admitting his letter to General Johnson, and (7) permitting the State to make an improper closing argument. *See Hall*, 2017 WL 1655616, at *10-13. On appeal to this Court, however, the only issues raised involve the sufficiency of the evidence and the propriety of admitting evidence of adult pornography. Consequently, it is unnecessary for us to recount the rulings of the intermediate appellate court on the other issues.

there were no audible comments or interactions between the victim and the Appellant in the video. However, we believe the depiction of "a middle-age man secreting a camera to record" the victim, which also occurred in *Whited*, and his walking to her bed "portray[ed] voyeurism and suggest[ed] a sexual connotation for the minor's engagement in everyday activities ordinarily done in the nude and in private." *Id.* at 446. Moreover, due to the small size of the room and the short distance between the dresser and the bed, the focal point of the video would have been the victim's private areas. Thus, we conclude that the evidence was sufficient for the trier of fact to conclude that the [Defendant] attempted to produce child pornography by recording the victim in a lascivious exhibition.

*Hall*, 2017 WL 1655616, at *8. Therefore, viewing the evidence in the light most favorable to the State, the intermediate appellate court concluded that the evidence was sufficient to convict the Defendant of attempted especially aggravated sexual exploitation of a minor.

The intermediate appellate court also held that Detective Gish's testimony regarding the adult pornography found on the Defendant's computer was irrelevant and should not have been admitted. *Id.* at *10. It determined, however, that any such error was harmless in light of the strength of the video evidence and the Defendant's lack of credibility. *Id.* Accordingly, the intermediate appellate court affirmed the Defendant's conviction and sentence.

We granted the Defendant's application for permission to appeal.

## ANALYSIS

On appeal, the Defendant first asserts that the evidence at trial was not sufficient to support his conviction for criminal attempt to commit the offense of especially aggravated sexual exploitation of a minor. He claims that, even when viewed in a light most favorable to the State, the evidence shows only that he was attempting to capture images of the Victim nude while she changed clothes for school. The Defendant asserts: "Even if [he] had succeeded in capturing these nude images, those images would not have been sufficient for" the offense of especially aggravated sexual exploitation of a minor.

- 9 -

The standard of review for a challenge to the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citation and internal quotation marks omitted). To obtain relief on a claim of insufficient evidence, the defendant must show that no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 324. The standard of review is the same regardless of whether the conviction is predicated on direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)); *see also State v. Adams*, 405 S.W.3d 641, 662 (Tenn. 2013) ("In *Dorantes*, this Court abolished any distinction between the standard of proof required at trial in cases based solely upon circumstantial evidence and that in cases where direct evidence of guilt is presented by the State."). Thus, "when the sufficiency of the evidence is challenged on appeal, the relevant question is simply whether, after reviewing the evidence—direct, circumstantial, or both—in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. William Eugene Hall*, 461 S.W.3d 469, 501 (Tenn. 2015).

On appeal, "[a] verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). As a result, the burden shifts from the State to the defendant to demonstrate that the evidence is insufficient to support the verdict. *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (citing *State v. Parker*, 350 S.W.3d 883, 903 (Tenn. 2011)). On appeal from a conviction, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992) (citing *State v. Cabbage*, 571 S.W.2d 832, 836 (Tenn. 1978)); *see also Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)). Questions involving the credibility of witnesses, the weight and value of the evidence, and all factual disputes raised by the evidence are entrusted to the trier of fact. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008); *Bland*, 958 S.W.2d at 659. This Court will not re-weigh the evidence, nor will it substitute its own inferences for those drawn by the trier of fact. *State v. Smith*, 436 S.W.3d 751, 764 (Tenn. 2014) (citing *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999)); *Wagner*, 382 S.W.3d at 297 (citing *Bland*, 958 S.W.2d at 659); *Dorantes*, 331 S.W.3d at 379; *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).

In the instant case, the Defendant was indicted for attempted especially aggravated sexual exploitation of a minor, or, in more common parlance, attempted production of child pornography. *See Whited*, 506 S.W.3d at 428 n.15. Tennessee Code Annotated section 39-17-1005 defines the offense as "knowingly . . . us[ing] . . . a minor to participate in . . . the production of . . . material that includes the minor engaging in . . . [s]exual activity." Tenn. Code Ann. § 39-17-1005(a)(1). "Sexual activity" is defined in a separate statute, Tennessee Code Annotated section 39-17-1002, which has several subparts. In this case, the applicable subpart defines "[s]exual activity" as "[l]ascivious exhibition of the female breast or the genitals, buttocks, anus or pubic or rectal area of any person."[12] *Id.* § 39-17-1002(8)(G).

As we have indicated, this Court in *Whited* recently addressed whether certain hidden-camera videos depicted minors engaging in a "lascivious exhibition" within the meaning of the child sexual exploitation statutes. To set up our analysis, we will review *Whited*'s facts and holding.

In *Whited*, the defendant had produced nine surreptitious videos of his twelve-year-old daughter and her fourteen-year-old friend in the nude and in various stages of undress by hiding his cell phone video camera in the daughter's bedroom and in a family bathroom. 506 S.W.3d at 419. In addition to depicting both minors in various degrees of nudity, each video also showed preliminary footage of the defendant "carefully setting up the hidden camera." *Id.* at 446. The defendant was then "seen exiting shortly before the unsuspecting victim appear[ed] onscreen and disrobe[d] to shower or change clothes." *Id.* Based on those videos, the defendant was convicted of nine counts of the *completed* offense of especially aggravated sexual exploitation of a minor and received an effective sentence of twenty-two years imprisonment. *Id.* at 424. The Court of Criminal Appeals affirmed the defendant's conviction and sentence. *See State v. Whited*, No. E2013-02523-CCA-R3-CD, 2015 WL 2097843, at *12-13 (Tenn. Ct. App. May 4, 2015), *rev'd* 506 S.W.3d 416 (Tenn. 2016).

This Court reversed the defendant's convictions based on insufficiency of the evidence. *Whited*, 506 S.W.3d at 447. As a preliminary matter, *Whited* held that the issue of whether a depiction rises to the level of a "lascivious exhibition" is a mixed

---

[12] There are several definitions of "sexual activity" in subsection 39-17-1002(8), including "[v]aginal, anal or oral intercourse, whether done with another person or an animal" and "[m]asturbation, whether done alone or with another human or animal." Tenn. Code Ann. § 39-17-1002(8)(A), (B). However, it is undisputed that the "[l]ascivious exhibition" definition is the only one applicable in the instant case.

- 11 -

question of fact and law. *Id.* at 427. The trier of fact determines whether "the depiction is a lascivious exhibition, including underlying factual issues such as the extent to which the minor appears nude or whether the minor appears to be portrayed in a sexually suggestive manner." *Id.* The court must determine, as a matter of law, whether the depiction is legally sufficient to constitute a "lascivious exhibition" within the meaning of the statute. *Id.*

The primary issue presented in *Whited* was the legal question—whether the minors in the videos were depicted engaging in "lascivious exhibitions" under the relevant statutes. In addressing this issue, *Whited* observed that the term "lascivious" means "tending to [incite] lust; lewd; indecent; obscene." *Id.* at 430 (citations omitted). "'Lewd' and [']lascivious' are synonyms; both have a sexual connotation." *Id.* The Court recognized that, "[w]hile defining the term 'lascivious' in the abstract is fairly straightforward, determining whether certain material depicts a minor engaging in the lascivious exhibition of their private body areas within the meaning of the sexual exploitation statutes is another matter. It is 'an intensely fact-bound question.'" *Id.* at 431 (quoting *United States v. Schuster*, 706 F.3d 800, 806 (7th Cir. 2013)).

*Whited* noted that a number of courts considering similar cases had recited six factors used in *United States v. Dost*, 636 F. Supp. 828 (S.D. Cal. 1986), *aff'd sub nom. United States v. Wiegand*, 812 F.2d 1239 (9th Cir. 1987), to determine whether a given visual image depicted a "lascivious exhibition" of a minor.[13] Many of the so-called *Dost* factors, such as the focal point of the visual image, the setting of the image, and the level of nudity, would often be relevant in making a "lasciviousness" determination. *Id.* at 436. However, *Whited* rejected as unworkable "the use of the *Dost* factors as a 'test' or an analytical framework for determining whether certain materials constitute child pornography."[14] *Id.* at 437. Lower courts were instructed to instead use "commonsense

---

[13] The *Dost* case involved the federal prohibition on the production of child pornography, 18 U.S.C. § 2251(a), which prohibits the use of a minor to engage in "sexually explicit conduct for the purpose of producing any visual depiction of such conduct." *See Dost*, 636 F. Supp. at 829-30. "Sexually explicit conduct" in the federal statutes, similar to "sexual activity" in the Tennessee statutes, is defined as "lascivious exhibition of the genitals or pubic area of any person." 18 U.S.C. § 2256(2)(A)(v).

[14] The Court in *Whited* reached this conclusion after an extensive review of cases in which the *Dost* factors were applied, ultimately concluding that "the *Dost* factors 'often create more confusion than clarity.'" *Whited*, 506 S.W.3d at 437 (quoting *United States v. Steen*, 634 F.3d 822, 829 (5th Cir. 2011) (Higginbotham, J., concurring)). *Whited* explained that, despite the recitation of numerous "caveats to the effect that the *Dost* factors are not 'comprehensive,' are not 'necessarily applicable in every situation,' are merely a 'starting point,' *et cetera* . . . [,] many [courts] seem inexorably drawn to using *Dost* as a lasciviousness definition or a test of sorts, with lengthy analysis and weighing of each 'factor' and debate

- 12 -

observation of the particular features of the subject materials" to identify "[s]exual activity" or lasciviousness. *Id.* "[J]udges [should use] their good sense to consider [the *Dost* factors] or any other features of a depiction that might tend to make it sexual or lascivious." *Id.*

*Whited* also pointed out that, with regard to the "lasciviousness" determination, "the language chosen by the General Assembly [in the child exploitation statutes] does not include any reference to the defendant's subjective purpose of sexual arousal or gratification." *Id.* at 439. In light of the omission of any such reference, *Whited* specifically rejected use of the sixth *Dost* factor (whether the depiction of the minor is intended to elicit a sexual response in the viewer) as "analytical quicksand." *Whited*, 506 S.W.3d at 437; *see also id.* at 437 n.26 (rejecting parties' arguments on objective versus subjective application of the sixth *Dost* factor as presenting a "false choice"); *id.* at 439 ("We have already rejected use of . . . the troublesome sixth *Dost* factor."). *Whited* concluded:

> [O]ur assessment of whether the material is prohibited by the child sexual exploitation statutes does not turn on the defendant's intent or purpose of sexual arousal or gratification. We consider the content of the material, irrespective of the defendant's subjective intent, to determine whether it includes a lascivious exhibition of the child's private body areas.

*Id.* at 441. Thus, the "lasciviousness" determination required under the Tennessee statute is based on objective consideration of the features of the material produced.

*Whited* also cautioned that the Tennessee statute should not be construed in a way that would make "mere nudity," without more,[15] a "lascivious exhibition" under the statute:

---

regarding different courts' interpretation of specific factors." *Id.* In this way, courts' use of the *Dost* factors as a definition of lasciviousness or a test "often ends up pulling them 'far afield' from the task at hand, namely, applying the statutory language to the materials at issue." *Id*. at 435 (quoting *United States v. Frabizio*, 459 F.3d 80, 87-88 (1st Cir. 2006) (criticizing district court for "apply[ing] the six *Dost* factors in a way that accorded to them the same status as the statutory definition [of lasciviousness] itself")).

[15] We also recognized in *Whited* that an *absence of* nudity in a depiction of a minor does not preclude a finding of a lascivious exhibition, "so long as there is an exhibition of private body areas that is lascivious in nature." *Whited*, 506 S.W.3d at 443 n.36 (citing exemplar cases).

- 13 -

Important to this case, it is generally accepted that mere nudity, without more, is insufficient to establish a lascivious exhibition of private body areas. The reasoning often proffered is that, if "lascivious" qualifies the term "exhibition" in the child sexual exploitation statute, mere nudity cannot be enough because such an interpretation would render the term "lascivious" superfluous.

Moreover, criminalizing conduct that involves a depiction of "mere nudity" may have constitutional implications. Therefore, when the subject materials depict a child in the nude, the task for a trier of fact is to determine whether the depiction is of "mere nudity" or whether it is of "sexual activity," i.e., a "lascivious exhibition."

*Id.* at 431 (citations omitted).

While a depiction of the "mere nudity" of a minor is not sufficient, other aspects of a depiction can move it along the continuum toward lasciviousness. Relevant to the instant case, *Whited* acknowledged that "the actions of persons other than the minor victim who appear in video or images can affect the perception of whether the exhibition of the minor's private body areas is 'lascivious.'" *Id.* at 446. The defendant in the nine videos at issue in *Whited* could be clearly seen setting up his camera and aiming it, stepping into the camera view to check positioning, and then re-positioning his camera. *Whited* explained: "Imagining a continuum, ranging from innocuous video of a fully clothed child all the way to explicit, hard-core pornographic images of a minor victim, these onscreen images of the defendant move the perception somewhat further along the continuum in the direction of lasciviousness." *Id.* Therefore, although "mere nudity" would be insufficient to establish "lasciviousness," nudity combined with other factors—such as the nature of the nudity depicted, emphasis or focus on private body areas, posing or coaching of the minor by the defendant, sound effects or commentary, or the defendant's presence in the depiction in a way that suggests a voyeuristic perspective—could be sufficient to make the depiction a lascivious exhibition.

Applying these principles to the videos in that case, *Whited* held that the depictions of the minors did not rise to the level of a lascivious exhibition within the meaning of the Tennessee statutes. *Whited*, 506 S.W.3d at 447. In reaching this conclusion, the *Whited* Court considered many aspects of the videos:

[A]ll of the videos include depictions of Daughter and/or Friend in various stages of undress, showing their private body areas, including bare breasts,

buttocks, and pubic areas. Certainly the hidden camera was positioned to capture the girls' nude bodies in the center of the screen, but we cannot say that the camera focused or "zoomed in" on the private areas to the extent deemed significant in factually similar hidden-camera cases that did not consider the defendant's subjective intent. Furthermore, nothing in the videos indicates that the victims were posed or coached; they are not in any unnatural or overtly sexual poses and appear unaware of the camera. In all of the videos, the victims are engaged in normal, everyday activities for the settings, such as showering and changing clothes. The defendant, at times, talks with the victims while he is secretly recording them. However, the conversations are innocuous, such as light banter with Daughter and Friend, encouraging Daughter to go ahead and take her shower, and so on. The recorded interactions with the victims are ordinary and do not enhance the sexuality of the video depictions of Daughter or Friend.

*Id.* at 446 (citations omitted). The Court held that the presence of the defendant in the videos in question was not enough to render them lascivious. It explained: "[I]f the nude videos of the victim, coupled only with the depiction of the defendant hiding the camera, were deemed prohibited material under the child sexual exploitation statutes, it would be difficult to distinguish the offense of production of child pornography from the lesser offenses that essentially criminalize voyeurism," such as observation without consent (Tenn. Code Ann. § 39-13-607) or photography without consent (Tenn. Code Ann. § 39-13-605(a)).[16] *Id.* at 446-47. It added, "So while we consider the defendant's appearance in the videos to be relevant, it does not, in and of itself, turn the videos into depictions of

---

[16] *Whited* explained:

> [B]oth offenses [observation without consent and photography without consent] explicitly include as an element of the offense that the defendant engaged in the prohibited conduct "for the purpose of sexual arousal or gratification of the defendant."
>
> Indeed, Tennessee's statute on photography without consent essentially dovetails with the child sexual exploitation statutes; unlawful photography provides a mirror image of sorts to the child sexual exploitation statutes. The unlawful photography statute explicitly includes the subjective intent of the accused as an element of the offense, but the content of the photographic image is not specified. In contrast, the child sexual exploitation statutes are quite specific about the content of the subject material, but they make no reference to the accused's subjective intent.

*Whited*, 506 S.W.3d at 439-40.

- 15 -

a minor engaging in a lascivious exhibition." *Id*. at 447. Thus, the videos at issue in *Whited* did not depict minors engaged in a "lascivious exhibition" of their private body areas; rather, they depicted minors "engaging in everyday activities that are appropriate for the settings and are not sexual or lascivious within the ordinary meaning of those terms." *Id*. Accordingly, the defendant's convictions were reversed and dismissed, and the case was remanded for resentencing on other crimes for which the defendant was convicted. *Id*. at 449.

Even though *Whited* reversed and dismissed the defendant's convictions for the completed crime of especially aggravated sexual exploitation of a minor, the Court noted that the evidence presented a "close question" regarding whether the evidence was sufficient for attempt:

> The facts in this case present a close question regarding whether the defendant intended to capture exactly what he recorded in the videos—minors engaged in everyday activities ordinarily done nude—or whether he intended to "cause a result that would constitute the offense" of production of child pornography by recording the minors engaged in a lascivious exhibition. Tenn. Code Ann. § 39-12-101[(a)](3). Considering the entirety of the record, "the evidence in the record is not so insufficient" so as to preclude a finding of attempted production of child pornography. *Cf. Maupin*, 859 S.W.2d at 318.

*Id*. at 448. On this basis, the Court permitted the State, on remand, to consider "retry[ing] the defendant on the lesser-included offense of attempt, if it so chooses." *Id*. ("[D]ouble jeopardy does not preclude the State from retrying the defendant on the lesser-included offense of attempt, should it choose to do so."). Thus, *Whited* left open the question of whether the evidence in that case would be sufficient to sustain a conviction for attempted especially aggravated sexual exploitation of a minor.

In this appeal, we are presented squarely with the question of whether the quantum and type of evidence against this Defendant is sufficient to support a conviction for attempted especially aggravated sexual exploitation of a minor. The elements of criminal attempt are set forth by statute:

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

- 16 -

(1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2) *Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part*; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a) (2014) (emphasis added). Although the trial court below did not explicitly state the subsection on which it relied, it appears that it applied the definition of attempt in subsection (a)(2).[17] In order to find a defendant guilty for attempt under this subsection, the State must submit "evidence that the defendant acted 'with the kind of culpability otherwise required for the offense' and acted 'with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part.'" *State v. Dotson*, 450 S.W.3d 1, 86-87 (Tenn. 2014) (quoting Tenn. Code Ann. § 39-12-101(a)(2)); *see also State v. Kimbrough*, 924 S.W.2d 888, 890 (Tenn. 1996) (citations omitted) ("An attempt, by nature, is a failure to accomplish what one *intended* to do. . . . [A]n attempt requires a desired, or at least an intended, consequence.").

Considering the criminal attempt statute along with the child sexual exploitation statutes, the evidence must show that the Defendant knowingly[18] acted (1) with intent to create a video that would include the Victim engaging in a lascivious exhibition of her private body areas and (2) with the belief that his conduct would cause the resulting crime intended "without further conduct on [his] part." *Id.* § 39-17-1005(a)(1); § 39-17-1002(8)(G); § 39-12-101(a)(2); *see Whited*, 506 S.W.3d at 448. Thus, in this appeal, we must determine whether the Defendant has shown that, after viewing the evidence in a light most favorable to the verdict, no rational trier of fact could have found beyond a

---

[17] The parties also indicate in their briefs that subsection (a)(2) is the applicable definition in this case.

[18] "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b) (2014).

- 17 -

reasonable doubt that the Defendant knowingly intended to produce material including the Victim engaged in a lascivious exhibition and believed that he would produce such material without any further conduct on his part. *See Jackson*, 443 U.S. at 319, 324; *Davis*, 354 S.W.3d at 729.

A defendant's "intent can rarely be shown by direct proof and must, necessarily, be shown by circumstantial evidence." *Herman Hall v. State*, 490 S.W.2d 495, 496 (Tenn. 1973); *see also State v. Brown*, 311 S.W.3d 422, 432 (Tenn. 2010). Intent and belief are both questions of fact. *See, e.g.*, *Brown*, 311 S.W.3d at 432; *Buggs*, 995 S.W.2d at 107. Consequently, as to both intent and belief, "we give the State the strongest legitimate view of the evidence." *Whited*, 506 S.W.3d at 427.

We first address the State's argument that, in proving that the Defendant had the requisite intent and belief for criminal attempt instead of the completed offense, the State was "not obligated to prove that the [D]efendant had a reasonable likelihood of actually capturing lustful behavior on film." It explains:

> [T]he State was not obligated to prove that the [D]efendant had a reasonable chance of success in his aims or a reasonable belief that he would be successful. Rather, the State needed only to prove that [the Defendant] acted with an intent to cause a result that is an element of the crime. *The factfinder need not contemplate what the resulting video would have shown under different circumstances but what the [D]efendant hoped it would show, however realistic or unrealistic that hope might have been.*

(Emphasis added). The State adds that "the statutory definition of criminal attempt does not include an element concerning the probability of success. . . . The State need not show that the [D]efendant reasonably intended to cause the result or reasonably believed that the conduct would in fact cause the result."

Based on this premise, the State argues that the Defendant's conduct supported an inference that he had the intent and belief, however unrealistic, that the Victim would engage in "sexual activity" or "lustful behavior" while his hidden camera was recording. Because the State is not obliged to prove that the Defendant's intent or belief was reasonable, it maintains, the evidence in this case was sufficient to support a conviction for attempted production of a video that included the Victim engaged in the "lascivious exhibition" of her private body areas.

- 18 -

We disagree with the State's argument that the reasonableness of a defendant's expectations is irrelevant to a conviction of attempt. An assessment of what a defendant reasonably could have expected to result from his course of conduct is a normal step in determining whether he had the requisite intent and belief to commit the underlying completed crime. In a case involving a similar charge of attempt under the federal statutes, the Sixth Circuit explained:

> "[T]he pivotal issue is intent." The intent element of the charged offense requires the government to prove that [the defendant] specifically intended to obtain a lascivious image when he stood outside [the victim's] bedroom window with a video camera. Proving that [the defendant] had that intent might be more difficult than it seems. Although the videos focus on [the victim's] pubic area and buttocks, even the government says the images are only "borderline lascivious." Thus, even someone like [the defendant] *might not realistically expect—and thus not intend—to obtain lascivious footage*, i.e., child pornography, when filming a girl toweling off after a shower.

*United States v. Sims*, 708 F.3d 832, 835 (6th Cir. 2013) (citation omitted) (emphasis added). A factual finding that the Defendant had unrealistic intent or beliefs regarding the images he would capture by secreting a camera in the Victim's bedroom cannot be based on speculation; it must be grounded in evidence indicating that a defendant *actually* harbored such "unrealistic" or "unreasonable" expectations or beliefs.

The State also distinguishes this case from *Whited* and argues that, in the instant case, whether the Defendant had the intent to produce material that includes a lascivious exhibition "is subjective, not objective." The State acknowledges, and we have explained, that the "lasciviousness" determination for the *completed* crime of production of child pornography must be based on objective consideration of the actual features of the material produced by the defendant.[19] *Whited*, 506 S.W.3d at 441. Because the Defendant's conviction in this case was for criminal *attempt* instead of the completed offense, the State argues, the standard used is not the objective standard used in *Whited*; instead, the Defendant's intent to create material that includes the child in a lascivious exhibition is judged on a subjective basis.

---

[19] To reiterate, the completed crime "does not include as an element of the offense the accused's intent or purpose of sexual arousal or gratification," so we "consider the content of the material, irrespective of the defendant's subjective intent, to determine whether it includes a lascivious exhibition of the child's private body areas." *Whited*, 506 S.W.3d at 441.

Certainly we agree that criminal attempt necessarily focuses on the defendant's state of mind and not whether the *completed* video was actually lascivious. *See Sims*, 708 F.3d at 835 ("[T]he government does not need to prove that the videos of [the minor] were actually lascivious."); *United States v. Vanderwal*, 533 F. App'x 498, 502 (6th Cir. 2013) (contrasting a charge of the attempted offense with a charge of the completed offense and noting that "one focuses on a defendant's state of mind when taking action towards a crime that is not consummated, the other is an analysis of whether a given image or video is lascivious").

However, for criminal attempt to commit especially aggravated sexual exploitation of a minor, the fact that a defendant may have had the subjective intent to capture an exhibition that would give *him* sexual arousal or gratification is not the intent at issue. A defendant's subjective intent to elicit his *own* sexual response from the material produced differs from intent to create material that includes a "lascivious exhibition," judged on an objective basis.[20] The trier of fact must determine whether the evidence shows that the depictions the defendant subjectively *intended* to record and *believed* he would capture would have objectively constituted a "lascivious exhibition" of a minor's private body areas.[21] Thus, the issue in this case is whether there sufficient evidence to show that the Defendant *intended* to record and *believed* he would record, had he not been interrupted by the Victim's discovery of his camera, material that would include a lascivious exhibition of the Victim's private body areas.

With these clarifications, we now assess the sufficiency of the evidence in the instant case. Given the similarity to the facts in *Whited*, we look at whether the evidence is sufficient to show that the Defendant intended to produce a video that would be further along the "lasciviousness" continuum than the videos in *Whited*.

---

[20] As one judge put it: "A pedophile may be aroused by photos of children at a bus stop wearing winter coats, but these are not pornographic." *United States v. Steen*, 634 F.3d 822, 829 (5th Cir. 2011) (Higginbotham, J., concurring).

[21] In *Whited* we noted that, "because Tennessee's child sexual exploitation statutes define the prohibited material in the same way regardless of whether the defendant is accused of production, distribution, or mere possession, we look at the depiction of the child to determine whether that material would be deemed prohibited if the accused merely possessed it and we knew nothing about the circumstances of its making." *Whited*, 506 S.W.3d at 441. In the context of criminal attempt, we look at whether the evidence shows that the material the defendant intended to produce, and believed he would produce without any further conduct, would be prohibited if merely *possessed*.

Viewing the evidence in a light most favorable to the trial court's judgment, we give due deference to the trial court's implicit credibility determination against the Defendant and reject his innocuous explanations for his conduct. *See Campbell*, 245 S.W.3d at 335; *Bland*, 958 S.W.2d at 659. Rather, it can reasonably be inferred from the evidence that the Defendant made the first "test" video to determine where to place the camera in order to capture the area in the Victim's bedroom at the foot of her bed where she would be changing clothes, in accordance with her normal routine after her morning shower. When the Defendant placed his camera in the Victim's bedroom for the second video, it can reasonably be inferred that he intentionally hid it under bra inserts on her dresser[22] and pointed it to face that same open space near the foot of the Victim's bed where she would be expected to undress and change clothes. The lens of the camera was stagnant; it was placed so that the frame centered on the Victim's torso, but it was not "zoomed in."[23] Thus, it can reasonably be inferred from all of the evidence that the Defendant intended to capture a video depiction of the minor Victim in the nude, both as she changed clothes in the room and as she walked towards the camera to collect her undergarments.

These depictions are similar to those in *Whited*, in which the camera was situated so as to capture the victims as they walked about in the bedroom or bathroom nude, performing ordinary activities such as grooming or changing clothes. The camera frame in *Whited* was centered on the victims' midsections, in closer range when they approached the camera. When the camera was hidden near the sink in the bathroom, the victim in *Whited* came into closer range when she approached the sink to groom her hair, just as the Victim in this case came into closer range as she approached her dresser to get undergarments out of her dresser drawer. In *Whited*, those videos were deemed not to be portrayals of a minor engaged in the "lascivious exhibition" of her private body parts.

The State argues that the totality of the evidence, viewed in a light most favorable to the verdict, shows that the Defendant did not merely attempt to produce a video of the type involved in *Whited*; rather, the Defendant attempted "to capture images that would excite lust." The aspects of the video that "put it over the edge" from innocuous to

---

[22] The proof at trial indicated that the camera was hidden under bra inserts, although that fact is not apparent from the video.

[23] The record does not indicate whether the Defendant's camera had a "zoom" feature, but regardless, neither of the resulting videos show evidence of the use of a "zoom" feature.

lascivious, the State argues, are the Defendant's "extensive staging" and "careful placement" of the camera, with the Victim's bed in the center range of the camera frame. The State claims that the Defendant carefully placed the camera on the dresser in order to capture the Victim walking toward it, knowing that her undergarments were on the dresser, so as to produce a close-up shot of her breasts and other private body areas.

From our review of both videos in this case, it cannot reasonably be inferred that the Defendant intended to capture depictions of the Victim that were appreciably different from those in *Whited*. The evidence certainly supports a finding that the Defendant engaged in so-called "staging" by ensuring optimal placement of the camera so as to aim the camera towards the center of the Victim's bedroom to capture a view of the Victim's midsection while she was near her bed and to capture closer-range images as the Victim approached her dresser to retrieve undergarments. The bathroom videos in *Whited* involved similar "staging." *Whited*, 506 S.W.3d at 442. This evidence of "staging" establishes that the Defendant intended to video the Victim in the nude while changing clothes, but it does not give rise to an inference that the Defendant attempted to obtain a video any more sexualized than the videos in *Whited*.[24]

The State points out that the Defendant positioned the camera so that the video would include the bed in the frame and the Victim in the vicinity of the bed. The State also notes the Defendant's activities in the video, claiming that the Defendant is shown in the video "examining" the Victim's bed, repeatedly going back to it, and is then seen "doing something while facing" the Victim's bed. All of this conduct, the State argues, purportedly demonstrates that the Defendant had an "inordinate interest" in the Victim's bed. Stressing that it is not obliged to show that the Defendant's intent and belief were reasonable, the State contends that "[t]he [D]efendant's apparent fixation on [the Victim's] bed supported the inference that he intended to capture sexual activity by [the Victim]."

This is a bridge too far. In the video, the Defendant's face cannot be seen, so his visual focus cannot be determined. Rather than appearing fixated on anything in particular, the Defendant appears to be walking about the Victim's bedroom rather

---

[24] We agree with the dissent that the Defendant's multiple innocuous explanations were not credible, and we give no credit to his testimony. We further agree that the evidence supports an inference that the Defendant intended to capture video of the Victim fully nude when she undressed and as she approached her dresser. However, the Defendant's lack of credibility does not substitute for evidence that the Defendant intended to capture, or believed his hidden camera would capture, an image of anything more than mere nudity.

- 22 -

aimlessly; his precise activities simply cannot be determined from viewing the video. As to the Victim's anticipated activities in her bedroom, the only evidence in the record is her own testimony about her morning routine: showering, returning to her bedroom fully clothed, and then changing clothes for school.[25] Neither the Defendant's conduct in the video nor the Victim's testimony amount to evidence that the Defendant *actually* harbored subjective expectations or beliefs—even "unrealistic" or "unreasonable" ones— that the Victim would engage in "sexual activity" or "lustful behavior" as the hidden camera rolled.[26]

To the extent that the State invites the Court to engage in sheer speculation about the Defendant's hopes and fantasies, we respectfully decline to do so. Any finding regarding the Defendant's intent or belief must be grounded in evidence, not in speculation. Absent such evidence, the trier of fact must determine what facts can reasonably be inferred from the evidence. In other words, it must consider whether the Defendant could "realistically expect—and thus . . . intend—to obtain lascivious footage, i.e., child pornography," from filming the Victim changing clothes for school. *Sims*, 708 F.3d at 835. While "the State is entitled to the strongest legitimate view of the evidence" at trial, it may *only* rely on "reasonable or legitimate inferences which may be drawn" from that evidence. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The State has pointed to no evidence sufficient to support an inference that the Defendant had an intent

---

[25] Some hidden-camera cases have involved concrete evidence of overt attempts (successful or otherwise) to persuade a child to engage in sexual activity for the purpose of then surreptitiously recording the child engaged in the activity. *See, e.g.*, *Diorec v. State*, 295 P.3d 409, 412 (Alaska Ct. App. 2013) (describing the defendant's hidden-camera recording of his fourteen-year-old stepdaughter's bedroom made after the defendant left her lubricants and sex toys in hopes of recording her using them). There is no such evidence in this case.

[26] In describing the Defendant's conduct, the dissent states that the Defendant "walked toward the victim's bed twice, ruffled through her clothes, and left the room." This description is not supported in the record, because the video does not show the Defendant actually touching items on the Victim's bed. Victim testified that, when she returned from the bathroom, her clothes "had been ruffled" and she "didn't remember them being that way when [she] left." We assume that the jury credited this testimony and give appropriate deference to it, so we assume for purposes of this appeal that the Defendant "ruffled" the Victim's clothes while Victim was in the shower, but it had to have taken place before the camera's video recording function was turned on. Thus, the record does not support the dissent's narrative, that the Defendant ruffled through Victim's clothes *after* he "walked toward the victim's bed twice" and then left the room, because these actions took place after the camera was turned on and were captured on the video. More importantly, any off-camera "ruffling" of the Victim's clothes does not move the needle to show that the Defendant intended to capture a video depiction of the Victim engaged in sexual activity.

or belief, reasonable or unreasonable, that he would capture video images of the Victim engaged in any behavior other than changing her clothes for school.

The State also argues that the Defendant's presence and conduct in the video created a strong voyeuristic perspective. Again focusing on the evidence in the video of the Defendant's supposed "inordinate interest" in or "fixation" on the Victim's bed,[27] the State argues that the video the Defendant intended to produce would have included a voyeuristic perspective sufficient to sexualize an otherwise innocent video.

For this aspect of the video, we need not project what the Defendant may have intended to record; that part of the video was completed before the Victim discovered the hidden camera. Consequently, in that respect, we can more directly compare it to the videos in *Whited*. Several of the *Whited* videos showed the defendant father setting up the hidden camera, stepping into the camera frame to check its positioning, and at times re-positioning it so as to capture a better view of the nude minor's private body areas as she emerged from the shower or changed clothes. *Whited*, 506 S.W.3d at 446. In the instant case, a portion of the Defendant's clothed midsection can be seen briefly in the beginning of the video, and his entire clothed midsection can be seen as he walks back and forth twice across the camera's view; his face is never seen. In contrast to *Whited*, the Defendant in this case does not position himself in front of the camera and then adjust the camera's frame to ensure optimal view of the Victim. As we have indicated, the Defendant's activities on camera appear almost aimless and are not suggestive of sexuality.

While the Defendant's presence in the video is relevant, it does not support a finding that the Defendant intended to create a video that would have been any more sexualized than the *Whited* videos. If anything, the voyeuristic perspective in the video in this case is more muted than that in *Whited*. Ultimately, the Defendant's presence and conduct in the video would not be sufficient to make the minor's "exhibition" in the video "lascivious" under the child sexual exploitation statutes.

---

[27] This argument overlaps with the State's contention that the trier of fact may reasonably infer in this case that the Defendant intended and believed that he would capture images of the Victim engaged in "lustful" behavior, in that both arguments emphasize the Defendant's supposed "fixation" on the Victim's bed. However, it is a separate argument. The State in effect argues that the Defendant's purported inordinate interest in the Victim's bed in the video (1) demonstrates that he had a subjective though unrealistic belief that his hidden camera would record explicit sexual conduct by the Victim, and (2) enhances the voyeuristic element of the video, making it lascivious under the child sexual exploitation statutes. These are two separate arguments, so we address them separately in this Opinion.

The State cites *United States v. Johnson*, 639 F.3d 433 (8th Cir. 2011), and urges us to follow the approach taken in that case. In *Johnson*, the defendant was a weightlifting coach at a sports medicine clinic. 639 F.3d at 435. He instructed minor female weightlifters to go into an examination room, strip naked, and weigh themselves. Unbeknownst to the victims, the defendant had set up a hidden camera in the examination room and took several surreptitious videos of the minor females as they weighed themselves in the nude. *Id.* at 435-36. The defendant's face could be seen in the videos adjusting and positioning the camera before the unsuspecting athletes came into the room to weigh. In at least one video, he could be heard pointedly asking one of the minor female athletes if she had "stripped down completely" before weighing herself. *Id.* at 436. The degree of the camera's zoom and the position of the scale changed from video to video. Some videos showed the minors' side view and others showed a frontal or a backside view, all while the minors were naked. *Id.*

The jury in *Johnson* convicted the defendant of attempted production of child pornography. *Id.* at 435. The district court then granted the defendant's motion for acquittal, concluding that while he may have been guilty of video voyeurism,[28] he had not attempted to persuade the minors "to engage in sexually explicit conduct so it could be captured on video." *Id.* at 437 (quoting the district court order). The district court found that the images on the defendant's videos "were not lascivious and only depicted mere nudity," and so the evidence was insufficient evidence to support the verdict of attempted production of child pornography. *Id.*

The Eighth Circuit Court of Appeals reversed, finding that the evidence was sufficient to establish the crime of attempted production of child pornography, even though there was no "lascivious exhibition" in the videos. *Id.* at 440-41. The appellate court noted that the defendant's camera was specifically pointed at the scale where the female athletes would be standing nude, at the defendant's direction, and the camera angle was such that the frame encompassed the minors' nude bodies "from their shoulders to below their knees." *Id.* It pointed out that, for some of the videos, the defendant coach adjusted the zoom feature of the camera "in an attempt to tighten the focus of the camera on the area where the females' genitals would be if they were to face the camera." *Id.* at 440. It also relied on statements the defendant made to police that he recorded the videos because he was curious as to what the minor females looked like nude and "that his 'pervertedness got the best of [him].'" *Id.* at 441 (alteration in original) (citation omitted). These statements, the appellate court held, satisfied the sixth

---

[28] The *Johnson* court stated that the defendant was not charged with the offense of video voyeurism "due to jurisdictional limitations." *Johnson*, 639 F.3d at 437.

*Dost* factor, that the defendant "intended the videos to be sexual in nature and to elicit a sexual response in the viewer." *Id*. For these reasons, the appellate court in *Johnson* reversed the acquittal and reinstated the jury's verdict. *Id*.

We agree that the factual scenario presented in *Johnson* is similar in some respects to the circumstances of the instant case. There are also, however, important distinctions. The conclusion in *Johnson* was based in part on the problematic sixth *Dost* factor, whether the depiction is intended to elicit a sexual response in the viewer, a factor that was specifically rejected in *Whited* based on the language in the Tennessee child pornography statutes. *Johnson*, 639 F.3d at 441; *Whited*, 506 S.W.3d at 437, 439. In so concluding, the appellate court in *Johnson* relied on incriminating statements by the defendant that his "pervertedness" motivated his actions. *Johnson*, 639 F.3d at 441. There are no such incriminating statements in the instant case. Furthermore, the *Johnson* court based its conclusion in part on the defendant's repeated attempts to use the "zoom feature" on the camera to provide a close-up view of the minors' genital area. *See id*. at 436. Here, the recording was intercepted by the Victim and there is no evidence indicating that the Defendant intended to "zoom" the camera in on the Victim's private body areas. Finally, the videos in *Johnson* included audible comments by the defendant "pointedly ask[ing] the young woman . . . if she had stripped completely."[29] *Id*. There are no comments whatsoever by the Defendant in the videos in the instant case. Ultimately, then, the *Johnson* court's affirmance of the defendant's conviction for

---

[29] In other cases, the defendant's comments or other sounds accompanying the video images sexualized images of minors engaged in everyday activities performed in the nude. For example, in *United States v. Petroske*, No. 17-CR-0116 (PJS/LIB), 2018 WL 672505 (D. Minn. Feb. 2, 2018), the defendant was convicted of producing or attempting to produce child pornography when "he surreptitiously recorded minors in various states of undress through their bathroom or bedroom windows." *Petroske*, 2018 WL 672505, at *1. In some of the videos, the defendant could be heard masturbating and making sexual comments about the bodies of the victims. *Id*. at *1-2. The district court observed that the videos were "voyeur videos," which "are a well-known category of pornography." *Id*. at *5. The voyeuristic nature of the videos, "combined with the videos' 'soundtrack' of [the defendant] masturbating and making crude sexual comments, could have led a reasonable jury to conclude that the exhibitions of genitals in [the defendant's] videos were lascivious." *Id*. Under these circumstances, the district court held that "a reasonable jury could have concluded that when [the defendant] set out each night—camera phone in hand—to stalk his prey, he did so with the intent of producing videos that contained the lascivious display of genitals." *Id*. Again, there is no comparable evidence in the instant case.

attempted production of child pornography was based on a different legal standard applied to a different set of facts. Consequently, we find it unpersuasive.[30]

The dissent cites *State v. Grisham*, No. E2015-02446-CCA-R3-CD, 2017 WL 1806829 (Tenn. Crim. App. May 5, 2017), *perm. app. denied* (Tenn. Sept. 20, 2017), in support of its conclusion that the evidence in the instant case is sufficient to support the Defendant's conviction of attempt. In our view, however, *Grisham* demonstrates the type of evidence that is critically lacking in the instant case.

In *Grisham*, the Court of Criminal Appeals reversed the defendant's conviction for the *completed* offense of especially aggravated sexual exploitation of a minor, but it modified the defendant's conviction to *attempted* especially aggravated sexual exploitation.[31] *Grisham*, 2017 WL 1806829, at *25. Although both *Grisham* and the instant case involve the secret videotaping of a minor performing "everyday activities ordinarily performed nude,"[32] *Whited*, 506 S.W.3d at 447, the similarities end there. *Grisham*'s conclusion on attempt was based on much more evidence probative of the defendant's intent than is present in the instant case.

First, the *Grisham* defendant figured much more prominently in the completed video than does the Defendant in the instant case, engaged in behavior that could be viewed as indicating his intent. The *Grisham* defendant could be seen setting up his cell-

---

[30] The dissent also cites the videos in *Johnson* as an example of "the type of material that some courts have found to be even further along the continuum towards lasciviousness and beyond mere voyeurism." However, the dissent fails to acknowledge the factors in *Johnson* that are not present in the instant case, namely, the *Johnson* defendant's repeated attempts to "zoom" the camera on the victims' private body areas, his audible sexual comments on the video, his incriminating reference to his own "pervertedness," and the *Johnson* court's reliance on the problematic sixth *Dost* factor, specifically rejected in *Whited*.

[31] Without explaining its decision to modify the defendant's conviction, the Court of Criminal Appeals in *Grisham* said only that it agreed with the trial court's observation "that the evidence 'one hundred percent' supported an attempt conviction in this case." *Id.* at *21. Given the trial court's comments, this statement may indicate that the appellate court may have erroneously relied on the trial court's apparent misperception that the defendant's subjective purpose of his own sexual arousal or gratification is the requisite intent for the offense of criminal attempt to produce child pornography. *See Grisham*, 2017 WL 1806829, at *21. For this additional reason, we find that *Grisham* does not support the conclusion advocated by the dissent in this case.

[32] In *Grisham*, the defendant actually succeeded in capturing the minor showering, while the Defendant in the instant case only made an attempt to capture the minor in the nude. *See Grisham*, 2017 WL 1806829, at *1.

phone camera over the toilet and angling it in a downward direction, and he was standing in front of the toilet urinating, lifting his shirt to scratch his chest and nipples, licking his lips, and moving his tongue back and forth. *Grisham*, 2017 WL 1806829, at *23. Second, the record in *Grisham* included still shots of the same victim while nude. This supported an inference that the defendant in *Grisham* intended to manipulate otherwise innocuous video footage of the nude victim to turn it into a lascivious exhibition.[33] There was no such evidence in the instant case.

Most importantly, in *Grisham*, law enforcement's search of the defendant's belongings revealed that he was in possession of other forms of child pornography, including additional video footage and still photographs of the same naked minor, as well as "four images allegedly showing digital penetration of a six-month-old infant."[34] *Id.* at *1. While evidence that the defendant possessed other child pornography may not be relevant to the question of whether a *completed* visual image is lascivious, it may well be relevant to establish the defendant's intent to produce child pornography by videotaping the minor victim in the nude.[35] *Vanderwal*, 533 F. App'x at 502 (citation omitted)

---

[33] For cases that involve evidence that the defendant intended to take further actions to manipulate video footage in order to sexualize the depictions of nude minors engaged in everyday activities, see, for example: *United States v. McCall*, 833 F.3d 560, 561-62 (5th Cir. 2016), *cert. denied*, 137 S. Ct. 686, 196 L. Ed. 2d 566 (2017) (upholding guilty plea for attempting to produce child pornography where defendant transferred his cell phone's memory card to another device in order to create still images of the victim and modify them using zoom, exposures, and filters); *United States v. Theis*, 853 F.3d 1178, 1180 (10th Cir. 2017) (upholding conviction for attempted production of child pornography when the defendant took hidden-camera videos of an eleven-year-old female showering and using the toilet and then transferred the images to his computer and created still images that focused on her genital and pubic areas); *see also United States v. Holmes*, 814 F.3d 1246, 1252 (11th Cir. 2016) (holding that "a lascivious exhibition may be created by an individual who surreptitiously videos or photographs a minor and later captures or edits a depiction, even when the original depiction is one of an innocent child acting innocently").

[34] The defendant was charged with several crimes, including the completed crime of especially aggravated sexual exploitation of a minor. With respect to the photos of the six-month-old infant, the defendant was charged with sexual exploitation of a minor, that is, possession of child pornography. *Grisham*, 2017 WL 1806829, at *4.

[35] At the very least, the possession of child pornography is relevant to show that a defendant is, in fact, a pedophile. *See United States v. Lebovitz*, 401 F.3d 1263, 1271 (11th Cir. 2005) (quoting S. Rep. No. 104-358, at 12-13 (1996)) ("Law enforcement investigations have verified that pedophiles almost always collect child pornography or child erotica.").

("[B]road contextual evidence may be both relevant and admissible to prove a defendant's intent in creating an image.").[36] In the instant case, the record contains no evidence that the Defendant possessed any child pornography, either physically or digitally on any of his devices, and there is no evidence that he has had any history of involvement with child pornography. Thus, overall, *Grisham* points up the type of evidence that is lacking in this case; it does not support the dissent's conclusion that the evidence was sufficient to convict the Defendant of attempted especially aggravated sexual exploitation of a minor.

Indeed, the dissent's own narrative of what the evidence shows that this Defendant intended to produce describes a depiction no further "along the continuum in the direction of lasciviousness" than the completed videos in *Whited*. *Whited*, 506 S.W.3d at 446. The dissent describes the Defendant's video as "focused in on the victim's chest as she approached her dresser, and the moment before she grabbed the camera, her chest—though fully-clothed due to her quick discovery of the hidden device—occupied the vast majority of the camera's frame," noting that, even before the victim approached the dresser, the camera "was positioned so that only her torso from her shoulders to her upper-thighs was visible and not her face." Thus, the dissent stated, "it was reasonable for the trial court to find that the Defendant . . . believed he would have recorded a video capturing the victim's fully nude torso approaching her dresser." The dissent's description of the video this Defendant *intended* to produce should be compared to the Court of Criminal Appeals' description of one of the videos *actually* produced in *Whited*: "The top of the victim's buttocks was exposed as she remained standing with her back to the camera. Her breast and pubic area were visible as she stepped out of the shower and began to put on her clothes. Her breasts were visible after she put on her underwear, *and she briefly leaned directly over the camera to retrieve a towel*. Her breasts continued to remain visible as she put on her pants and stood inches away from the camera."[37] *Whited*, 2015 WL 2097843, at *3 (emphasis added). Even though the focal point of the camera was angled towards, in the words of the dissent, the minor's "bare chest as she leaned over her dresser to reach for clothing," captured while she was engaged in "everyday activities ordinarily performed nude," did not transform the completed video

---

[36] In *Vanderwal*, authorities found in the defendant's home 914 videos and 5,342 still images depicting child pornography. *Vanderwal*, 533 F. App'x at 499. In cases involving child pornography, it is not uncommon to find that the defendant possessed a "collection" of sorts. *See, e.g.*, *Sims*, 708 F.3d at 833 (uncovering "two disks containing at least 90 images of child pornography").

[37] Our opinion in *Whited* noted that "[t]he Court of Criminal Appeals included a detailed description of each video in its opinion." *Whited*, 506 S.W.3d at 442 n.33.

into a "lascivious exhibition" within the ordinary meaning of the statutory term.[38] *Whited*, 506 S.W.3d at 447; *see* Tenn. Code Ann. § 39-17-1002(8)(G). The same must be said of the video in this case. Therefore, even the dissent's own description of the video this Defendant intended to record would not carry the day under *Whited*.

Interestingly, the trial in the instant case was conducted before our decision in *Whited* was issued. Without the benefit of this Court's analysis in *Whited*, the State's position at trial was somewhat different than its position in this appeal. To counter the Defendant's contention that he was in the Victim's room for innocent reasons, the State argued at trial that the Defendant set his camera in the Victim's room to catch her in the nude while changing clothes. The State's closing argument is replete with assertions that, had the Defendant succeeded, he would have captured a depiction of the Victim changing clothes. A few examples of those assertions are illustrative: (1) "[The Defendant had] an intent and design to catch [Victim], a thirteen year old, changing clothes. And if [Victim] had not found the video camera, he would have succeeded. The victim would have been on video changing her clothes." (2) "If the [D]efendant had been successful, [the camera] would have caught [Victim], a thirteen year old minor, changing clothes." (3) "He didn't even point [the camera] at the fish, he pointed it in a way where a little girl was going to get naked. And that's what he wanted to see."[39]

Given the unsettled state of the law prior to *Whited*, the State's arguments at trial were not unreasonable. Nevertheless, they reveal the State's original position, that the evidence supported a finding that the Defendant attempted to capture the Victim in the nude while changing clothes. We agree with the State's position at trial—the evidence is sufficient to show that the Defendant intended to record a video of Victim in the nude while changing clothes. We do not agree, however, with the State's position on appeal, that there is sufficient evidence to find that the Defendant intended to record, or believed he would record, anything more than that.

---

[38] The dissent notes that "some courts have found [this type of material] to be even further along the continuum towards lasciviousness and beyond mere voyeurism." It ignores the fact, however, that *our own* Court in *Whited* found this type of material, without more, to be insufficient for a finding of lasciviousness.

[39] The State did *not* argue at trial that the evidence showed that the Defendant had a "fixation" on the Victim's bed or that the Defendant had an intent and belief that he would capture a depiction of the Victim engaged in "lustful" behavior.

Considering the record overall, we must conclude there is no evidence on which the trier of fact could have relied to support a finding that the Defendant intended to record on his camera anything more than the Victim engaging "in everyday activities ordinarily performed nude," or that he believed that he would record anything more, by hiding the camera in the Victim's bedroom. *Whited*, 506 S.W.3d at 447. While the evidence was sufficient to support a conclusion that the Defendant's conduct was reprehensible and may have violated other criminal laws,[40] it was insufficient to support a conviction for attempted especially aggravated sexual exploitation of a minor.

## CONCLUSION

We agree with the Defendant that the evidence in the record, even when viewed in a light most favorable to the verdict, is insufficient to support his conviction for attempted especially aggravated sexual exploitation of a minor. All other issues raised on appeal are pretermitted. The conviction of Defendant David Scott Hall for attempted especially aggravated sexual exploitation of a minor is reversed, and the case is dismissed.

_____
HOLLY KIRBY, JUSTICE

---

[40] *See Whited*, 506 S.W.3d at 439 (discussing the lesser crimes of observation without consent (Tenn. Code Ann. § 39-13-607(a)) and photography without consent (Tenn. Code Ann. § 39-13-605(a)) as compared to the child sexual exploitation statutes).

- 31 -